UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| HEALTHCARE DISTRIBUTION ALLIANCE, | CIVIL ACTION NO. : 3:25-cv-1724 |
| *Plaintiff*, | |
| v. | |
| MARK D. BOUGHTON, in his official capacity as Commissioner of the Connecticut Department of Revenue Services, and WILLIAM TONG, in his official capacity as Attorney General for the State of Connecticut, | |
| *Defendants*. | OCTOBER 14, 2025 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Healthcare Distribution Alliance ("HDA") brings this complaint against Mark D. Boughton, in his official capacity as Commissioner of the Connecticut Department of Revenue Services ("Commissioner"), and William Tong, in his official capacity as Attorney General for the State of Connecticut ("Attorney General" and collectively, "Defendants"). HDA brings this complaint on behalf of its members, based on personal knowledge as to HDA facts and upon information and belief as to all other matters:

### NATURE OF THE ACTION

1.  In this action, HDA challenges an extraordinary Connecticut law, the Drug Price Cap of Public Act No. 25-168 ("the Drug Price Cap"), which seeks to cap the prices charged by manufacturers and wholesale distributors for off-patent branded drugs, generic drugs, and interchangeable biologic products (the "covered products"). The Drug Price Cap threatens to disrupt the essential logistical function performed by wholesale distributors: ensuring the safe, efficient, and reliable delivery of 10.5 million healthcare products every day from manufacturers to pharmacies, hospitals, and other healthcare providers.

1

2. The Drug Price Cap freezes the price of a covered product at the Wholesale Acquisition Cost ("WAC") (*i.e.*, the manufacturer's list price) as of January 1, 2025, adjusted by the Consumer Price Index ("CPI"), unless the drug or biological product has been identified by the federal Department of Health and Human Services ("HHS") as being in shortage. Wholesale distributors do not set or control the WAC for drug products, and they do not introduce or withdraw drugs from the national market. Yet the Drug Price Cap imposes massive penalties on wholesale distributors if covered products are sold in Connecticut at prices exceeding the WAC. These draconian penalties include imprisonment for officers or employees of wholesaler distributors for the conduct of third-party manufacturers outside their control.

3. First and foremost, the Drug Price Cap violates the Commerce Clause's per se prohibition on extraterritorial state legislation. Though cast as a local economic regulation, the Drug Price Cap targets commerce and pricing decisions that occur wholly outside Connecticut. Drug manufacturers (not wholesale distributors) set the WAC, and they do so on a national, not state-by-state, basis. Wholesale distributors also operate on an interstate basis under contracts with manufacturers that are not tailored to individual states. Indeed, no member of HDA has any distribution facility inside Connecticut. By capping prices set at the national level, Connecticut's law effectively governs out-of-state commerce.

4. If permitted to stand, the Drug Price Cap would encourage other states to apply their own views of what price increases are permissible nationwide, resulting in a patchwork of inconsistent and conflicting pricing regimes. Wholesale distributors would be forced to navigate different sets of rules, and fragmentation of the market would increase drug costs, hinder supply chain efficiencies, establish inconsistent pricing for patients across state lines, and ultimately reduce reliable access to affordable medications for patients nationwide.

5. Separate from its impermissible direct regulation of wholly out-of-state transactions, the Drug Price Cap further violates the Commerce Clause by imposing an excessive burden on interstate commerce. The Drug Price Cap would discourage wholesale distributors from participating in the Connecticut market and risk isolating the state from the national drug market. Those negative effects impose a substantial burden on interstate commerce, which far outweighs any interest Connecticut may have in controlling drug prices.

6. The Drug Price Cap also violates the fundamental requirement of due process by imposing massive financial penalties on wholesale distributors for third-party conduct beyond their control. Given that wholesale distributors play no role in setting the WAC, the law's imposition of liability on distributors for manufacturer-driven pricing decisions is both inequitable and unsustainable as a matter of due process.

7. HDA members face imminent and irreparable injury from the Drug Price Cap. Indeed, WAC prices for numerous covered products have *already* increased during calendar year 2025 or are set to increase before the end of 2025. Because the Drug Price Cap uses the January 1, 2025 WAC (adjusted by the CPI) as its reference price, wholesale distributors *already* face a Hobson's choice: either (1) buy the covered product at the manufacturer's price *above* the January 1, 2025 WAC and sell to Connecticut customers at the January 1, 2025 WAC (*i.e.*, a *lower* price), or (2) sell to Connecticut customers at a price above the January 1, 2025 WAC and face severe civil penalties under the Drug Price Cap. Moreover, history indicates that in the future manufacturers will inevitably increase prices for additional covered products above the January 1, 2025 WAC (adjusted by the CPI). And if wholesale distributors attempt to avoid the Drug Price Cap by withdrawing a covered product from Connecticut, they will face a separate $500,000 civil

3

penalty. In any scenario, both HDA members and the public at large will suffer irreparable harm if the Drug Price Cap is implemented or enforced.

8. No federal appellate court has sustained the constitutionality of a similar law. State-level drug price caps have been invalidated in Maryland, Minnesota, and the District of Columbia. *See Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 668 (4th Cir. 2018) ("A state law violates the extraterritoriality principle if it . . . expressly applies to out-of-state commerce."); *id.* at 672 ("[T]he Act is effectively a price control statute that instructs manufacturers and wholesale distributors as to the prices they are permitted to charge in transactions that do not take place in Maryland."); *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 959–60 (8th Cir. 2025) (holding that a similar statute, which prohibited manufacturers of prescription drugs from "impos[ing], or caus[ing] to be imposed, an excessive price increase . . . on the sale of any generic or off-patent drug sold, dispensed, or delivered to any consumer in the state," had "the specific impermissible extraterritorial effect of controlling prices outside of Minnesota") (alterations in original); *Pharm. Rsch. & Mfrs. of Am. v. District of Columbia*, 406 F. Supp. 2d 56, 69–70 (D.D.C. 2005) (holding that the law "effect[ed] an impermissible extraterritorial reach" even though its application was "triggered by an in-state sale"), *aff'd sub nom. Biotech. Indus. Org. v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007); *see also Pharm. Rsch. & Mfrs. of Am. v. Comm'r, Maine Dep't of Hum. Servs.*, Civ. 00-157-B-H, 2000 WL 34290605, at *2 (D. Me. Oct. 26, 2000) (striking down Maine drug price cap on extraterritoriality grounds), *rev'd on other grounds sub nom. Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66 (1st Cir. 2001).[1]

---

[1] A federal court recently denied a preliminary injunction motion against an Illinois drug price regulation on the basis of a Commerce Clause challenge, Memorandum Opinion and Order, *Ass'n for Accessible Meds. v. Raoul*, Case No. 1:24-cv-00544, 2025 WL 2764558 (N.D. Ill. Sept. 26, 2025), but its reasoning is unpersuasive.

4

9.  For these reasons, and as explained below, HDA seeks an injunction against the implementation and enforcement of the Drug Price Cap, a declaration that the Drug Price Cap is unconstitutional, preempted, and invalid on its face, and any other relief this Court deems appropriate.

## JURISDICTION AND VENUE

10.  HDA's causes of action arise under 42 U.S.C. § 1983 and the United States Constitution.  The Court thus has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

11.  The Drug Price Cap is effective July 1, 2025.  That it does not purport to govern transactions until January 1, 2026 does not render this action unripe.  *See, e.g.*, *Pierce v. Soc'y of Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 536 (1925).

12.  This Court has personal jurisdiction over Defendants because Defendants reside within this judicial district.

13.  Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to these claims have occurred or will occur in this district and because Defendants reside in this District.

## THE PARTIES

14.  HDA is a national trade association representing pharmaceutical wholesale distributors.  Its core mission is to promote the safe, efficient and secure distribution of pharmaceutical products to licensed healthcare providers and patients across the United States. HDA members ship approximately 10.5 million diverse medical products across the nation every day.  A substantial part of HDA's mission is to advocate for its members' interests, including

through lobbying and litigation, and this lawsuit is germane to its purpose. HDA is authorized by its Board of Directors to bring this suit on its members' behalf.

15. Mark D. Boughton is Commissioner of the Connecticut Department of Revenue Services, and charged with implementation and enforcement of the Drug Price Cap. Public Act No. 25-168, § 345(3).

16. William Tong is Attorney General for the State of Connecticut and responsible for the enforcement of the statutes of Connecticut.

17. Defendants and those subject to Defendants' supervision, direction, or control are responsible for the enforcement of the Act. In enforcing, administering, and adhering to the Act, Defendants and those subject to Defendants' supervision, direction, or control will act under color of state law.

## BACKGROUND

### I. Connecticut's Drug Price Cap

18. The Drug Price Cap establishes a "reference price" for branded drug products that have been off patent for at least 24 months, generic drug products, and interchangeable biologic products. Public Act No. 25-168, § 345. The "reference price" is defined as the WAC on January 1, 2025 for branded drug products when the patent has expired, the WAC on the date a patent expires, or for generic drugs, the WAC on January 1, 2025 or when the product is first commercially available. *Id*. § 345(11).

19. Beginning on January 1, 2026, a manufacturer or wholesaler is prohibited from selling a covered product in Connecticut at a price that exceeds the reference price adjusted for any increase in the CPI unless the drug has been identified by HHS as being in shortage. *Id.* § 346(a).

20. Any manufacturer or wholesaler that violates this provision is subject to civil penalty equal to 80% of the difference between: (i) revenue the manufacturer or wholesaler would have earned from all sales of the identified drug in the state in the calendar year, and (ii) revenue that the manufacturer or wholesale distributor would have earned from all sales of the drug in the state during the calendar year if the manufacturer or wholesaler had sold the product at a price that did not exceed the reference price. *Id*. § 346(b)(1). Entities are not held liable if sales in Connecticut are under $250,000. *Id*. § 346(b)(2).

21. Penalties extend to officers and employees of the manufacturer or wholesaler who owe a duty to pay the civil penalty imposed, or who are to deliver or disclose information to the Commissioner. These penalties can include a fine of up to $1,000/day, one year imprisonment, or imposition of a Class D felony. *Id.* § 346(j).

22. The law also prohibits wholesalers from withdrawing prescription drugs from Connecticut without 180 days' notice and also prohibits them from withdrawing drugs for the purpose of avoiding the civil penalties prescribed by the Act, subject to a $500,000 civil penalty. *Id*. § 347.

23. The Drug Price Cap does not apply to the in-state Connecticut retailers and other entities (such as medical practices, hospitals, and other licensed healthcare providers) that actually sell covered products to consumers. Those retailers and other entities are free to charge whatever they wish under the Drug Price Cap, which applies only to out-of-state manufacturers and wholesale distributors. *Id*. § 346.

II.     **The Role of Wholesale Distributors in the Pharmaceutical Supply Chain**

24. The U.S. pharmaceutical supply chain is a complex system. It comprises several kinds of entities that work to ensure products' safe, secure, and efficient delivery. Wholesale

distributors move products from manufacturers to healthcare institutions, providers, and pharmacies. These distributors do not manufacture, produce, or prescribe pharmaceutical products, nor do they engage in pharmaceutical research and development. Rather, they coordinate receipt and delivery of pharmaceutical products from the manufacturers who make them and who, in many cases, market them to pharmacies, hospitals, and other licensed dispensers, who provide them to patients when prescribed.

25. By serving as intermediaries, distributors reduce the number of transactions that would occur if providers and retailers had to order products directly from manufacturers. Distributors efficiently and securely serve more than 200,000 U.S.-based pharmacies, hospitals, clinics, long-term care facilities, and other patient-facing organizations. They do this through a network of distribution centers geographically dispersed across the nation, each of which processes 4,100 orders daily on average. These distribution centers and the systems they support provide consistent just-in-time delivery to their service areas so that providers can reliably deliver high quality care to patients.

26. In the interest of efficiency, distributors work closely with manufacturers, providers, and other supply-chain partners to accurately forecast demand and ensure timely and secure delivery to pharmacies and other licensed providers. Distributors also manage inventory, provide financial credit, maintain pharmacy management systems, and support retail operations.

27. Distributors invest significant time, energy, and resources to ensure that pharmaceutical products are shipped under the right conditions to the right customers at the right time. They ensure safe supply chains by maintaining drugs' proper temperatures, providing manufacturers data on where their products are used, verifying that customers are eligible to purchase products, and complying with federal and state regulations.

28. These services are critical. Without distributors, each medical provider would have to order, receive, and store products directly from manufacturers. Without distributors' just-in-time delivery, medical providers would have to maintain large inventories of expensive products. Inventories at local distribution facilities prevent critical medical products from going out of stock. These functions make the supply chain more efficient, reliable, and secure, and they ensure that patients can get medicines when they need them.

### III.  The Drug Price Cap Seeks to Regulate Extraterritorial Drug Pricing Decisions.

29. Manufacturers set the WAC for drug products on a national basis, outside Connecticut. Even the Drug Price Cap itself acknowledges the nationwide nature of drug price determinations, by referring to *national* pricing benchmarks in connection with its own price provisions. Under § 345(11), the term "wholesale acquisition cost," commonly known as WAC, is given the same meaning as in Title 42 of the U.S. Code. *See* 42 U.S.C. § 1395w-3A(c)(6)(B) (defining "wholesale acquisition cost" to mean "the manufacturer's list price for the drug . . . to wholesalers or direct purchasers in the United States . . . as reported in wholesale price guides or other publications of drug or biological pricing data").

30. Wholesale distributors also operate on an interstate, rather than state-by-state, basis. Given the integrated nature of the pharmaceutical supply chain, wholesale distributors structure their contractual relationships with manufacturers and with downstream customers with multistate operations through interstate agreements that apply uniformly across states. Further, many customers of wholesale distributors typically maintain operations across numerous states and expect pricing to be consistent, rather than subject to variation based on individual state markets.

31. No member of HDA has any distribution facility inside Connecticut. Products distributed in Connecticut are shipped from distribution centers located outside the state.

32. In short, the relevant pricing decisions are made outside Connecticut. By imposing state-specific pricing controls, the Drug Price Cap governs out-of-state commerce and threatens to disrupt the uniformity of the national pharmaceutical market. The law's extraterritorial scope could hardly be clearer.

## PLAINTIFF'S CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**(Declaratory/Injunctive Relief against All Defendants—
Unconstitutional Extraterritorial Regulation)**

33. Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs of this Complaint.

34. The Commerce Clause not only vests Congress with "Power . . . [t]o regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. I, § 8, cl. 3, but also prohibits states from interfering with interstate commerce. "The critical inquiry" under this "dormant" aspect of the Commerce Clause "is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336 (1989).

35. In addition, the "Constitution's horizontal separation of powers"—reflected in the fundamental principle of coequal sovereignty among the states, the Constitution's specific provisions restricting states' ability to control conduct outside their territorial bounds, the "historical understandings of the Constitution's structure," and "the principles of 'sovereignty and comity' it embraces"—prohibits states from directly regulating transactions that occur wholly outside their borders. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 & n.1 (2023) (citation omitted).

36. The Drug Price Cap violates the Commerce Clause because it directly regulates interstate commerce and prices beyond the boundaries of the State of Connecticut and expressly targets pricing determinations and conduct occurring exclusively outside of the state. Indeed, the Drug Price Cap itself acknowledges and refers to ***national*** pricing benchmarks (WAC) in connection with its own price provisions.

37. Because the Drug Price Cap regulates conduct occurring entirely outside of the State of Connecticut and "has the practical effect of establishing 'a scale of prices for use in other states,'" *Healy*, 491 U.S. at 336 (quoting *Baldwin v. G. A. F. Seelig, Inc.*, 294 U.S. 511, 528 (1935)), it violates the Commerce Clause, and is void.

38. The Drug Price Cap further interferes with interstate commerce because it prohibits wholesalers from withdrawing prescription drugs from Connecticut without 180 days' notice and from withdrawing drugs for the purpose of avoiding the civil penalties prescribed by the Act, subject to a $500,000 civil penalty. In fact, the requirement not to "withdraw" drugs from the state is nonsensical because wholesale distributors have no distribution centers in Connecticut in the first place.

## SECOND CAUSE OF ACTION

**(Declaratory/Injunctive Relief against All Defendants—
Excessive Burden on Interstate Commerce)**

39. Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs of this Complaint.

40. Even if Connecticut's attempt to directly regulate out-of-state transactions were not per se invalid, it would still violate the Commerce Clause because the burden imposed on interstate commerce by such extraterritorial regulation "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970).

11

41. The substantial disruptions caused by Connecticut's pricing regime, which could potentially be followed by other states, will create enormous inefficiencies in the supply chain and result in significant delays in the supply and delivery of, and reliable patient access to, life-saving medicines throughout the United States. The law will also force wholesale distributors to incur substantial costs to alter their contracting and delivery processes, or to comply with the law nationwide. HDA members will suffer financial injury as a result of the Drug Price Cap regardless of the option they choose. Those cumulative effects on all relevant market actors impose a substantial burden on interstate commerce, which far outweighs any interest Connecticut may have. Accordingly, the Drug Price Cap is unconstitutional.

## **THIRD CAUSE OF ACTION**

**(Declaratory/Injunctive Relief against All Defendants—
Arbitrary and Confiscatory Rates of Return)**

42. Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs of this Complaint.

43. The Drug Price Cap denies wholesale distributors a fair and reasonable return by freezing prices at the January 1, 2025 WAC, adjusted by the CPI, unless the drug has been identified by HHS as being in shortage. This ignores the substantial contribution made by wholesale distributors to the healthcare system and will produce arbitrary, unreasonable, and confiscatory rates of return for wholesale distributors.

44. The Due Process Clause of the Fourteenth Amendment provides that no state may deprive a person "of life, liberty, or property, without due process of law." The Equal Protection Clause protects Plaintiff and its members against arbitrary action. And the Fifth Amendment provides that "private property" shall not "be taken for public use[] without just compensation." The Drug Price Cap violates each of these constitutional guarantees.

## FOURTH CAUSE OF ACTION

### (Declaratory/Injunctive Relief against All Defendants—Due Process)

45. Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs of this Complaint.

46. The Drug Price Cap exposes wholesale distributors to penalties for activities beyond their control. Wholesale distributors operate under contract with manufacturers and do not set or control the WAC for drug products.

47. Imposing penalties on wholesale distributors (and their officers and employees) for activities beyond their control violates the Due Process Clause of the Fourteenth Amendment, which provides that no state may deprive a person "of life, liberty, or property, without due process of law." The Due Process Clause restricts states' authority to "regulate and control activities wholly beyond [their] boundaries," *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954), in the absence of "some minimal contact[s]" between both the "regulated party and the state" and "the regulated subject matter and the state," *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236 (11th Cir. 2001) (emphasis omitted) (citation omitted).

## FIFTH CAUSE OF ACTION

### (Declaratory/Injunctive Relief Against all Defendants—Impairment of Contracts)

48. The Drug Price Cap imposes a severe and unexpected liability on wholesale distributors simply for carrying out their obligations under their contracts with manufacturers and with customers such as pharmacies, medical practices, and hospitals.

49. The impairment is not a necessary and reasonable exercise of the state's police power to serve a significant public purpose.

50.     Accordingly, the Drug Price Cap violates the Impairment of Contracts Clause of Article I, § 10, cl. 1.  *See Allied Structural Steel v. Spannaus*, 438 U.S. 234 (1978).

## SIXTH CAUSE OF ACTION

### (Declaratory/Injunctive Relief Against all Defendants— Preemption Under the Supremacy Clause)

51.     Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs of this Complaint.

52.     The Drug Price Cap is preempted insofar as it purports to dictate the prices that federal healthcare programs—such as Medicare, TRICARE, the Veterans Health Administration, and the Federal Employees Health Benefits Program—are required to pay for prescription drugs on behalf of beneficiaries of those programs.  In doing so, the Drug Price Cap directly regulates federal activities and interferes with the operation of federal healthcare programs.  It is well settled that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943).

53.     In addition, the Drug Price Cap is preempted by federal statutes, including the Inflation Reduction Act (42 U.S.C. § 1320f), Medicare drug pricing provisions, and the 340B Drug Pricing Program, which together establish comprehensive federal oversight of pharmaceutical pricing and access.  For example, federal Medicare programs contain "sweeping" preemption provisions that displace the Drug Price Cap. *Pharm. Care Mgmt. Ass'n v. Mulready* (*PCMA*), 78 F.4th 1183, 1206 (10th Cir. 2023).  Medicare Parts C and D are public-private partnerships between the federal Centers for Medicare & Medicaid Services and private insurers (called plan sponsors).  Plan sponsors may offer prescription-drug coverage to Medicare recipients and must abide by federal statutes and regulations in doing so.  Against that "backdrop of extensive federal regulation," Medicare Parts C and D have "broad preemption clause[s]." *Id*. at 1205.  Those

clauses provide, in relevant part, that "[t]he standards established under [Part C or D] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Part C or D plans] which are offered by [plan sponsors] under [Part C or D]." 42 U.S.C. § 1395w-26(b)(3) (Part C); *see id*. § 1395w-112(g) (incorporating same preemption clause into Part D). The Tenth Circuit has held that this "sweeping" preemption language "is 'akin to field preemption' and precludes States from regulating Part [C or] D plans except for licensing and plan solvency." *PCMA*, 78 F.4th at 1206 (citation omitted).

54. These principles make clear that Connecticut's Drug Price Cap is preempted insofar as it purports to dictate the prices that Medicare and other federal healthcare programs must pay for prescription drugs on behalf of beneficiaries of those programs.

## SEVENTH CAUSE OF ACTION

**(All Defendants—42 U.S.C. § 1983 and 42 U.S.C. § 1988)**

55. Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs of this Complaint.

56. By seeking to implement and threatening to enforce the Drug Price Cap, Defendants, acting under color of state law, have violated and, unless enjoined by this Court, will continue to violate the rights of HDA members to engage in interstate commerce free from unconstitutional state interference as well as their rights under other constitutional provisions.

57. An actual "Case or Controversy" exists because the Drug Price Cap's constitutional infirmities create a genuine, credible, and immediate threat that Defendants—acting in their official capacities under color of state law—will violate Plaintiff's constitutionally protected rights. HDA's members have no adequate remedy at law available against Defendants for the infringement of their constitutional rights.

58. Plaintiff accordingly seeks a declaration that Defendants' implementation or enforcement of the Drug Price Cap would violate 42 U.S.C. § 1983. Plaintiff also seeks reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## **RELIEF REQUESTED**

WHEREFORE, HDA prays:

A. For a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Drug Price Cap violates the United States Constitution, including but not limited to the dormant Commerce Clause, the Supremacy Clause, the Impairment of Contracts Clause, and the Fifth and Fourteenth Amendments, and is therefore void on its face and unenforceable;

B. For a preliminary injunction prohibiting Defendants and their agents, servants, employees, and all persons in active concert or participation with them from implementing or enforcing the Drug Price Cap;

C. For a permanent injunction prohibiting Defendants and their agents, servants, employees, and all persons in active concert or participation with them from implementing or enforcing the Drug Price Cap;

D. For such costs and reasonable attorneys' fees to which it might be entitled by law; and

E. For any other relief that the Court deems just and proper.

Dated: October 14, 2025
Hartford, Connecticut

Respectfully submitted,

/s/ Thomas J. Finn
Thomas J. Finn (ct20929)
Snigdha Mamillapalli (ct31142)
**MCCARTER & ENGLISH, LLP**
185 Asylum Street, 36th Floor
Hartford, CT 06103
Tel.: (860) 275-6700
Fax: (860) 724-3397
tfinn@mccarter.com
smamillapalli@mccarter.com

Jonathan S. Massey
(*pro hac vice* motion forthcoming)
Bret R. Vallacher
(*pro hac vice* motion forthcoming)
Austin S. Martin
(*pro hac vice* motion forthcoming)
**MASSEY & GAIL LLP**
1000 Maine Ave SW, Suite 450
Washington, D.C. 20024
Tel.: (202) 652-4511
Fax: (312) 379-0467
jmassey@masseygail.com
bvallacher@masseygail.com
amartin@masseygail.com

*Attorneys for Healthcare Distribution Alliance*