## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HEALTHCARE DISTRIBUTION ALLIANCE,<br>    *Plaintiff*, | ) ) ) ) | Civil No. 3:25-cv-1724-OAW |
| v. | ) ) ) | |
| MARK D. BOUGHTON (in his official capacity as Commissioner of the Connecticut Department of Revenue Services) and WILLIAM TONG (in his official capacity as Attorney General for the State of Connecticut),<br>    *Defendants*. | ) ) ) ) ) ) ) ) | |

## ORDER

**THIS ACTION** is before the court upon the Motion for a Preliminary Injunction filed by Plaintiff Healthcare Distribution Alliance (hereinafter, "HDA"). ECF No. 27.

HDA is a national trade association representing wholesale distributors of prescription drugs. ECF No. 27-1, at 1. It seeks to enjoin the Attorney General of Connecticut, Defendant William Tong, and the Commissioner of Connecticut's Department of Revenue Services, Defendant Mark D. Boughton, from enforcing against its members Sections 345 through 347 of Public Act No. 25-168 (hereinafter, the "Act"), which will "cap" the prices of certain prescription drugs sold by certain manufacturers and distributors in Connecticut beginning on January 1, 2026. *Id.*

The court held a hearing on the Motion on December 9, 2025, *see* ECF No. 40, and carefully has reviewed the parties' initial and supplemental memoranda of law, as well as the broader record before it, *see* ECF Nos. 27, 27-1–27-5, 34, 35, 41, 42, 43, 44, 44-1–44-3. For the reasons that follow, the Motion is **DENIED.**

1

I.    BACKGROUND

A. Rising Prescription Drug Costs

The "rising cost of prescription drugs presents a significant challenge" to maintaining and improving people's health.  Conn. Gen. Assembly's Prescription Drug Task Force, Final Rep. and Recommendations, at 2 (Feb. 26, 2025) (available at https://www.cga.ct.gov/hs/taskforce.asp?TF=20241204_Prescription%20Drug%20Task %20Force); *see also Ass'n for Accessible Medicines v. Raoul*, No. 24-C-544, 2025 WL 2764558, at *1 (N.D. Ill. Sept. 26, 2025) (acknowledging "skyrocketing drug prices, sometimes by more than 1,000%, and sometimes overnight," in 2025); *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 674 (4th Cir. 2018) (Wynn, J., dissenting) (noting, in 2018, "a series of high-profile incidents" of "multiple-thousand-fold price increases for single-source generic drugs that treat rare and life-threatening conditions"); *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 649 n.1 (2003) (acknowledging, in 2003, that prescription drug costs "increased at an average annual rate . . . [higher] than any other component of the healthcare sector") (internal citation and quotation marks omitted).

A "'significant portion'" of Connecticut residents "'delay filling prescriptions, cut pills in half, and take extreme measures because of these costs.'"  Liese Klein, *New Connecticut laws aim to tame surging prescription drug prices for patients, hospitals*, CT Insider (Jul. 27, 2025), https://www.ctinsider.com/ business/article/new-laws-target-rising-prescription-drug-costs-20786384.php (quoting Alex Reger, Director of the Connecticut Office of Health Strategy's HealthCare Benchmarks Initiative); *see also* Conn. Off. of Health Strategy, Cost Growth Benchmark Initiative Rep., at 51 (Apr. 24,

2025) (available at https://portal.ct.gov/ohs/services/cost-growth-quality-benchmarks-primary-care-target/reports-and-updates?language=en_US). Indeed, in a recent statewide survey, nearly one quarter of respondents—and, notably, nearly one third of respondents whose annual household incomes were under $50,000—admitted to "rationing" prescription drugs "due to cost concerns." Healthcare Value Hub, Connecticut Survey Respondents Struggle to Afford High Health Care Costs; Worry about Affording Health Care in the Future; Express Bipartisan Support for Policy Solutions, at 1–2 (September 2025) (available at https://healthcarevaluehub.org/wp-content/uploads/2025-Affordability-Brief.pdf); *see also* Healthcare Value Hub, Connecticut Residents Struggle to Afford High Healthcare Costs; Worry about Affording Healthcare in the Future; Support Government Action across Party Lines, (Oct. 18, 2022) (available at https://healthcarevaluehub.org/chess-state-survey/        connecticut/2022/connecticut-residents-struggle-to-afford-high-healthcare-costs-worry-about-affording-healthcare-in-the-future-support-government-action-across-party-lines/).[1]

In response, Connecticut's General Assembly empaneled a "bipartisan, bicameral" task force to propose policies for lowering prescription drug costs. Conn. Gen. Assembly's Prescription Drug Task Force, Final Rep. and Recommendations, at 2 (Feb. 26, 2025) (available at https://www.cga.ct.gov/hs/taskforce.asp?TF=20241204_Prescription%20Drug%20Task%20Force). Governor Ned Lamont also proposed policies with the same goal. Press Release, Governor Lamont Announces 2025 Legislative Proposal: Reduce Prescription Drug Costs (Feb. 6, 2025) (available at https://portal.ct.

---

[1] The court "may take judicial notice of facts 'not subject to reasonable dispute' when they 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Kravitz as Tr. of Aegean Litig. Tr. v. Tavlarios*, No. 20-2579-CV, 2021 WL 5365582, at *3 (2d Cir. Nov. 18, 2021) (summary order) (quoting Fed. R. Evid. 201(b)(2)).

gov/governor/news/press-releases/2025/02-2025/governor-lamont-announces-2025-

legislative-proposal-reduce-prescription-drug-costs?language=en_US).    In July 2025,

several of the governor's and the task force's proposals became laws, including the Act.

ECF Nos. 27-1, at 7; 34, at 6; *see* Margaret A. Bartiromo and Stephen M. Cowherd, *New*

*Connecticut Health Care Laws Effective in the New Year*, Pullman & Comley Conn.

Health Blog (Nov. 5, 2025), https://www.pullcom.com/connecticut-health-law- blog/new-

connecticut-health-care-laws-effective-in-the-new-year).

### B. The Act

The Act regulates sales of certain prescription drugs[2] in Connecticut by certain

manufacturers and distributors,[3] but not sales by retailers.  ECF Nos. 27-1, at 3; 34, at 6.

"This is largely a function of how the . . . prescription drug industry is structured."  *Raoul*,

2025 WL 2764558, at *1; *see also* ECF Nos. 27-1, at 3–4; 34 at 2–6.   Put simply,

manufacturers of prescription drugs "sell nationally" to distributors, who then "resell" to

retailers, "who in turn sell to patients."  *Raoul*, 2025 WL 2764558, at *1 (internal citation

and quotation marks omitted); *see also Ass'n for Accessible Medicines v. Ellison*, 140

F.4th 957, 959 (8th Cir. 2025).   The price set by manufacturers is called the "wholesale

acquisition cost" (hereinafter, "WAC").   *Raoul*, 2025 WL 2764558, at *1; *see also* ECF

Nos. 27-1, at 1–2, 4; 34, at 2–4.   Manufacturers "actually sell drugs" to distributors at

negotiated prices, oftentimes "far below . . . WAC."   *In re Pharm. Indus. Average*

*Wholesale Price Litig.,* 230 F.R.D. 61, 68 (D. Mass. 2005); *see also* ECF No. 34, at 3–4.

---

[2] The Act applies to sales of any "brand-name drug or biological product to which all exclusive marketing rights granted under . . . [federal law] have expired for at least twenty-four months," and any "generic drug."  *See* Public Act No. 25-168, § 345(6).

[3] The Act applies to manufacturers and distributors who earn at least $250,000 "in total annual sales in this state."  *See* Public Act No. 25-168, § 346(b)(2).

Nevertheless, a drug's WAC "serves as the benchmark" for how it is priced by distributors and retailers. *Raoul, 2025 WL 2764558, at *1* (internal citation and quotation marks omitted); *see also Ellison*, 140 F.4th at 959 (describing the WAC as "the baseline price").

While the Act has many elements,[4] its primary operation is as a "drug price cap." ECF No. 34, at 6; *see also* ECF No. 27-1, at 1–3. Beginning on January 1, 2026, covered manufacturers and distributors will be prohibited from selling "an identified prescription drug in this state" at a price that exceeds the WAC set on January 1, 2025, as "adjusted for any increase in the consumer price index" (hereinafter, the "Reference Price"). Public Act No. 25-168, §§ 345(11), 346(a)(1); *see also* ECF Nos. 27-1, at 2; 34, at 6. Unless determined to be "in shortage" by the Secretary of Health and Human Services, selling an identified drug above its Reference Price will result in a civil penalty "equal to eighty per cent of the difference" between the revenue of the non-compliant sales and the revenue that would have been earned if such sales had complied with the Reference Price. Public Act No. 25-168 §§ 345(a)(2), 346(b)(1)(A)–(B); *see also* ECF Nos. 27-1, at 2–3; 34, at 7.

### C. The Motion for a Preliminary Injunction

HDA brought this action against Defendants on behalf of its members, all of whom are distributors located outside of Connecticut. ECF No. 1; *see also* ECF No. 27-1, at 2. The Association for Accessible Medicines (hereinafter, "AAM"), a national trade association representing manufacturers, brought a related action against Defendants. *Ass'n for Accessible Medicines v. Boughton et al*, No. 3:25-cv-01757-OAW, ECF No. 1

---

[4] For example, it is a violation of the Act for covered manufacturers and distributors to withdraw their prescription drugs from Connecticut to avoid compliance therewith. *See* Public Act No. 25-168, § 347(a). The Act also requires certain officers and employees of such manufacturers and distributors to report certain information to the Connecticut Department of Revenue Services. *See id.*, § 346(j)(1).

(D. Conn. Oct. 17, 2025).  On October 23, 2025, HDA and AAM filed separate motions for preliminary injunction.  ECF No. 27; *Boughton*, No. 3:25-cv-01757-OAW, at ECF No. 20.  At their request, the court held a consolidated hearing thereupon, on December 9, 2025.  ECF Nos. 31, 32, 40; *Boughton*, No. 3:25-cv-01757-OAW, at ECF Nos. 25, 27, 32.

HDA and AAM contemplated a broad interpretation of the Act in their initial memoranda of law, as if the Act encompassed identified drugs sold outside of Connecticut but later made available by third-parties to patients in Connecticut.  *See* ECF No. 27-1, at 7–11, 12–17; 35, at 1–7; *see also Boughton*, No. 3:25-cv-01757-OAW, at ECF Nos. 20-1, 30.  Laws similar to the Act operate (or have operated) in this manner in other states. *See, e.g.*, *Raoul*, 2025 WL 2764558, at *1 (describing a similar state law in Illinois); *Ellison*, 140 F.4th at 959 (describing a similar state law in Minnesota); *Pharm. Rsch. & Manufacturers of Am. v. Comm'r, Maine Dep't of Hum. Servs.*, No. CIV. 00-157-B-H, 2000 WL 34290605, at *1–*2 (D. Me. Oct. 26, 2000), *rev'd sub nom. Pharm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, (2003) (describing a similar state law in Maine); *Pharm. Rsch. & Mfrs. of Am. v. D.C.*, 406 F. Supp. 2d 56, 60–61 (D.D.C. 2005), *aff'd sub nom. Biotechnology Indus. Org. v. D.C.*, 496 F.3d 1362 (Fed. Cir. 2007) (describing a similar law in the District of Columbia).

At the hearing, Defendants clarified "*for the first time*" that they do not interpret the Act so broadly, and only intend to enforce it against covered manufacturers and distributors selling identified drugs where title is taken in Connecticut.  ECF No. 41 (emphasis in original); *see also* ECF Nos. 42, at 38:3–8; 43, at 2.  Accordingly, the court ordered the parties to submit "limited supplemental briefing" explaining how Defendants'

"position on the Act's applicability . . . as articulated at the hearing, affects the merits" of HDA's and AAM's motions for preliminary injunctions.  ECF No. 41.  On December 12, 2025, Defendants confirmed their position on the Act's applicability in their supplemental memoranda of law.  ECF No. 43, at 2; *see also Boughton*, No. 3:25-cv-01757-OAW, at ECF No. 36.

Because AAM's members do not sell identified drugs to any distributors who take title to such drugs in Connecticut, AAM voluntarily dismissed its action against Defendants on December 16, 2025.  *Boughton*, No. 3:25-cv-01757-OAW, at ECF Nos. 39, 40.  HDA's members *do* sell identified drugs to retailers who take title to such drugs in Connecticut.  ECF No. 44, at 1–3.  Accordingly, HDA submitted a supplemental memorandum of law on December 16, 2025, urging the court to grant its Motion for a Preliminary Injunction and arguing that the Act violates the dormant Commerce Clause of the United States Constitution.  *Id.* at 3–10; *see also* ECF Nos. 27-1, at 7–11, 12–17; 35, at 1–7.

## II.    <u>LEGAL STANDARD</u>

A preliminary injunction is "not a matter of right."  *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 217 (D. Conn. 2020).  It is "'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'"  *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original)).

Where, as here, the movant "seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the . . . likelihood-

of-success standard." *Cnty. of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008) (citing *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir.2000)).   To do so, HDA must demonstrate, by "a better than fifty percent probability," *see Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 76 (D. Conn. 2023), *aff'd*, 153 F.4th 213 (2d Cir. 2025) internal citations and quotation marks omitted), that **(i)** it is "likely to succeed on the merits" of its claims, **(ii)** its members are "likely to suffer irreparable harm" absent a preliminary injunction, **(iii)** the "balance of equities tips" in its favor, and **(iv)** a preliminary injunction "would be in the public interest," *see Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025); *see also Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010).

The United States Court of Appeals for the Second Circuit (hereinafter, the "Second Circuit") "reviews a grant or denial of a preliminary injunction for abuse of discretion." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004).   However, "where allegations of error in a preliminary injunction involve questions of law . . . review is *de novo.*" *Briggs v. Bremby*, 792 F.3d 239, 241 (2d Cir. 2015); *see also Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 228–229 (2d Cir. 2025).

## III.   DISCUSSION

HDA claims that the Act violates the dormant Commerce Clause.   ECF Nos. 27-1, at 7–11, 12–17; 35, at 1–7; 44, at 3–10.[5]

---

[5] HDA devoted all but three paragraphs of its thirty-one-page initial memorandum of law, *see* ECF No. 27-1, at 11-12, nearly all of its time at the December 9, 2025, hearing, *see* ECF No. 42, and the entirety of its supplemental memorandum of law, *see* ECF No. 44, to its dormant Commerce Clause claim. Nonetheless, HDA also alleges that the Act violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by attempting to "regulate and control activities wholly beyond its boundaries.'" ECF No. 27-1, at 12 (quoting *Watson v. Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954)).  Given Defendants' clarification of the Act's applicability, *see* ECF Nos. 41, 43, the court does not find that HDA is likely to succeed on the merits of its Due Process Clause claim.

A. **Likelihood of Success on the Merits**

The Commerce Clause vests United States Congress with the exclusive authority to "'regulate Commerce . . . among the several States.'" *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 118 (2d Cir. 2024) (citing U.S. Const. art. I, § 8, cl. 3). Within it, "the Supreme Court has interpreted a negative implication known as the 'dormant' Commerce Clause, intended to prevent 'economic protectionism'" by prohibiting state laws that "'benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273, (1988)). "As a judge-made and enforced doctrine, the strictures of the dormant Commerce Clause have ebbed and flowed over time through case law, with the Supreme Court refining the doctrine's proper scope." *Flynt v. Bonta*, 131 F.4th 918, 923 (9th Cir. 2025). It did so most recently in *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023). *See, e.g., id.* at 924 (acknowledging that *Pork Producers* "substantially clarified" the dormant Commerce Clause); *New Jersey Staffing All. v. Fais*, 749 F. Supp. 3d 511, 525 (D.N.J. 2023), *aff'd*, 110 F.4th 201 (3d Cir. 2024) (describing *Pork Producers* as a "revolution").

A state law generally violates the dormant Commerce Clause if it **(i)** "'clearly discriminates against interstate commerce in favor of intrastate commerce,'" **(ii)** "'imposes a burden on interstate commerce incommensurate with the local benefits secured,'" or **(iii)** "'has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question.'" *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 113 (2d Cir. 2025) (quoting *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021)). "For many years," courts accepted the theory that "a challenged law's extraterritorial effects" could render it unconstitutional

under the dormant Commerce Clause.  *Fais*, 749 F. Supp. 3d at 524, *aff'd*, 110 F.4th at 209.  However, *Pork Producers* clarified that "extraterritorial effects alone are no longer sufficient to show a violation."  *Id.* (describing the extraterritoriality principle as "a dead letter" after *Pork Producers*); *see also GenBioPro, Inc. v. Sorsaia*, No. CV 3:23-0058, 2023 WL 5490179, at *11 (S.D.W. Va. Aug. 24, 2023), *aff'd sub nom. GenBioPro, Inc. v. Raynes*, 144 F.4th 258 (4th Cir. 2025) (acknowledging that *Pork Producers* "abrogated" the "principle against extraterritoriality" as articulated in prior case law, including *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664 (4th Cir. 2018)); *New York Times Co. v. Microsoft Corp.*, 777 F. Supp. 3d 283, 326 (S.D.N.Y. 2025) (acknowledging that *Pork Producers* "rejected" the "theory" of extraterritoriality).  In the modern, "interconnected national marketplace, many (maybe most) state laws," "long understood to represent valid exercises of the [s]tates' constitutionally reserved powers," necessarily will have extraterritorial effects.  *Pork Producers*, 598 U.S. at 374–375.  Accordingly, a challenged law must have the "*specific* impermissible 'extraterritorial effect'" of discriminating against interstate commerce, *see id.* at 373–374 (citing *Baldwin v. G.A.F. Seelig, Inc.* 294 U.S. 511 (1935); *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986); *Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989)), or "directly" regulating commerce occurring "wholly" out-of-state, *see id.* at 376 n. 1 (citing *Edgar v. MITE Corp.*, 457 U.S. 624, (1982)), to run afoul of the dormant Commerce Clause.

The Supreme Court's "dormant Commerce Clause jurisprudence has 'eschewed formalism for a sensitive, case-by-case analysis of purposes and effects.'" *Rest. L. Ctr.*, 90 F.4th at 119 (citing *West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 201 (1994)).  That is because "the dormant Commerce Clause's scope is not 'absolute.'" *Id.* at 118

(citing *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).  Indeed, "states retain 'broad power'

to regulate their own affairs, even if they 'bear adversely upon interstate commerce.'" *Id.*

(citing *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 531–32 (1949)).  Therefore, the

Second Circuit warns judges "not to wield the dormant Commerce Clause as 'a roving

license . . . to decide what activities are appropriate for state and local government to

undertake.'"  *Id.* (citing *Pork Producers*, 598 U.S. at 380 (Gorsuch, J., plurality opinion)).

### (i)    Discrimination

Under the dormant Commerce Clause, a state law is clearly discriminatory if it

authorizes "differential treatment of in-state and out-of-state economic interests that

benefits the former and burdens the latter."  *Rest. L. Ctr.*, 90 F.4th at 118 (internal citation

and quotation marks omitted).  Here, the Act applies to covered distributors regardless of

whether they are located or headquartered inside or outside of Connecticut.  *See* ECF

Nos. 41; 43, at 2.  Because the Act treats all covered distributors the same, it is not clearly

discriminatory.[6]  *See, e.g.*, *Iowa Pork Producers Ass'n v. Bonta*, No. 22-55336, 2024 WL

3158532, at *1 (9th Cir. June 25, 2024), *cert. denied*, 145 S. Ct. 2866, 222 L. Ed. 2d 1147

(2025) (finding that, because the challenged statute "'treats all [covered] companies

exactly the same,' it 'does not discriminate against interstate commerce'") (quoting *United

Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007));

*Fais*, 110 F.4th at 207 (finding that, because the challenged act "applies equally to in-

---

[6] For this reason, HDA also fails to demonstrate that the Act is discriminatory "in its effect."  *Rest. L. Ctr.*, 90 F.4th at 12 (acknowledging that "a law is only clearly discriminatory in its effect where it 'confer[s] a competitive advantage upon local business vis-à-vis out-of-state competitors'") (citing *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 49 (2d Cir. 2007)).  Although HDA argues that the Act advantages in-state retailers vis-a-vis out-of-state distributors, the comparison is inapposite, as retailers and distributors do not perform the same functions in the pharmaceutical industry, and therefore are not "competitors." *Id.*; *see also Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) (recognizing that "any notion of [economic] discrimination assumes a comparison of substantially similar entities").

state and out-of-state [covered] firms," it is not discriminatory); *Flynt*, 131 F.4th at 926 (finding that the challenged act is not discriminatory because it "appl[ies] evenly to Californians and non-Californians alike").

### (ii)    Undue Burden

"Even laws that do not explicitly discriminate against interstate commerce may incidentally, and impermissibly, burden interstate commerce."  *Nat'l Shooting Sports Found., Inc.*, 144 F.4th at 114.  HDA does not argue that the Act would fail the "permissive *Pike* balancing test" used to determine "whether a given statute imposes such a burden." *Id.* (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, (1970)).  However, its focus on the "potential . . . burdens on interstate commerce" which may result from the Act implies such an argument.  *Rest. L. Ctr.*, 90 F.4th at 121–122.

HDA's members sell prescription drugs "Free On Board ('F.O.B.') Destination," meaning that "title does not pass until the drug . . . is delivered to the [retailer] inside Connecticut."[7]  ECF No. 44, at 1–2.  To avoid liability under the Act for exceeding Reference Prices, HDA argues that its members would have to "completely overturn their existing business models," which depend on F.O.B. delivery.  *Id.* at 5.  It argues that doing so would be "not just impractical" but also "operationally impossible" before the Act takes effect on January 1, 2026.  *Id.* at 2, 4–5.  That argument fails the *Pike* test, as "regulations that impose wholesale change on a market's structure do not impermissibly burden commerce."  *Fais*, 749 F. Supp. 3d at 527, *aff'd*, 110 F.4th at 209 (citing *Exxon Corp. v. Gov. of Md.*, 437 U.S. 117, 127, (1978)); *see also Flynt*, 131 F.4th at 928 (recognizing that the dormant Commerce Clause does not "'protect[] the particular structure of

---

[7] And the F.O.B. industry standard reinforces the fact that the Act is not discriminatory, as it applies to *all* distributors making sales in Connecticut, regardless of where such distributors are based.

operation'" of a given industry) (quoting *Exxon Corp.*, 437 U.S. at 127); *Rest. L. Ctr.*, 90 F. 4th at 120 (finding that "the dormant Commerce Clause 'protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations'") (citing *Exxon Corp.*, 437 U.S. at 127).

HDA also argues that the Act is "Kafkaesque." ECF No. 44, at 3. Because it does not apply to retailers who sell to patients, or manufactures who set the WAC, distributors may "face potentially endless increases in WAC with no recourse" to maintain their current profitability and operations, and patients in Connecticut may continue facing rising costs.[8] *Id.* at 3–5; *see also* ECF No. 27-1, at 9–11. The court appreciates HDA's concerns, and does not deny the importance of distributors to the prescription drug industry. *See* ECF No. 27-1, at 3–4 (explaining that "distributors move approximately 10.5 million medical products across the nation every day from manufacturers" to retailers, thereby "reduc[ing] the number of transactions that would occur if . . . retailers had to order products directly from manufacturers"). Yet the court also appreciates that Connecticut enacted the Act "after compiling ample legislative findings" over the course of several months, *see Rest. L. Ctr.* 90 F.4th at 122, including from a "bipartisan, bicameral" task force comprised of "legislators, healthcare providers, pharmacists, patient advocates, pharmaceutical industry experts, insurers, manufacturers, pharmacy benefit managers, state agencies, and other key stakeholders," *see* Conn. Gen. Assembly's Prescription Drug Task Force, Final Rep. and Recommendations, at 2 (Feb. 26, 2025) (available at

---

[8] HDA laments that the WAC for several identified drugs has increased since January 1, 2025, but it fails to assert *by how much.* ECF Nos. 27-1, at 5–6; 44, at 2 n.3. If such increases were nominal, or otherwise less than (or even equal to) corresponding increases in the consumer price index, then it would seem that HDA's members could easily maintain their current profitability under the Act. *See* Public Act No. 25-168, §§ 345(11), 346(a)(1); *see also* ECF Nos. 27-1, at 2; 34, at 6.

https://www.cga.ct.gov/hs/taskforce.asp?TF=20241204_Prescription%20Drug%20Task
%20Force).  "Whatever the policy ramifications" of Connecticut's decision to focus on the
prices charged, in particular, by distributors, *see Fais*, 110 F.4th at 207, the court may not
enjoin "duly enacted state laws regulating the in-state sale of ordinary consumer goods,"
like prescription drugs, "based on nothing more" than HDA's "assessment" of the Act's
"costs and benefits.'"  *Pork Producers*, 598 U.S. at 380 (Gorsuch, J., plurality opinion);
*see also Rest. L. Ctr*. 90 F.4th at 118 (reminding district courts that "the dormant
Commerce Clause's scope is not absolute," that "states retain broad power to regulate
their own affairs," and that  judges should "not to wield the dormant Commerce Clause as
a roving license . . . to decide what activities are appropriate for state and local
government to undertake") (internal citations and quotation marks omitted).

### (iii)    Extraterritoriality

HDA argues that the Act will have the same "specific impermissible extraterritorial
effect[s]" as the challenged laws in *Baldwin v. G.A.F. Seelig, Inc.* 294 U.S. 511 (1935),
*Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986),
and *Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989).  ECF No. 27-1, at 8–10, 15–16; 35,
at 4–6; 44, at 8.  The court disagrees.

In *Baldwin*, the Supreme Court invalidated New York's law effectively prohibiting
out-of-state dairy farmers from selling milk in New York for less than the minimum price
legally guaranteed to in-state dairy farmers.  294 U.S. at 519–522 (explaining that "a state
may not, in any form or under any guise, directly burden the prosecution of interstate
business").  In *Brown-Forman*, the Court invalidated New York's law effectively prohibiting
liquor distillers from charging less for liquor in any other state than they charged for liquor

in New York.    476 U.S. at 582 (explaining that such law "regulates out-of-state transactions in violation of the [dormant] Commerce Clause").   And in *Healy*, the Court invalidated Connecticut's law effectively prohibiting beer merchants from selling beer at a cheaper price in any neighboring states than in Connecticut.  491 U.S. at 337 (explaining such law's "undeniable effect of controlling commercial activity occurring wholly outside the boundary of [Connecticut]").   The Court "struck down" these laws for being "plainly protectionist."   *Fais*, 749 F. Supp. 3d at 525, *aff'd*, 110 F.4th at 209; *see also Pork Producers*, 589 U.S. at 371–375.

To the extent HDA suggests that disrupting "established business practices" was among the specific impermissible extraterritorial effects of the laws challenged in *Baldwin*, *Brown-Forman*, and *Healy*, *see* ECF No. 44, at 5–6, the dormant Commerce Clause does not "'protect[] the particular structure or methods of operation'" of a given industry, *see Flynt*, 131 F.4th at 928; *see also Pork Producers*, 589 U.S. at 371 (finding, instead, that "each" of *Baldwin*, *Brown-Forman*, and *Healy* "typifies the familiar concern with preventing purposeful discrimination against out-of-state economic interests").

HDA asserts that tying "'the price of . . . in-state products to out-of-state prices" was among the specific impermissible extraterritorial effects.  ECF No. 44, at 8 (quoting *Pork Producers*, 589 U.S. at 374); *see also* 27-1, at 9–10, 15–16.  While the challenged laws in *Baldwin*, *Brown-Forman*, and *Healy* indeed tied in-state prices for milk, liquor, and beer to the prices of such products in specific other states, *see* 294 U.S. at 519–522; 476 U.S. at 582; 491 U.S. at 337, the Supreme Court did not invalidate such laws merely for taking the regulatory form of a price affirmation or price control, but because they "deliberately prevent[ed out-of-state firms] from undertaking competitive pricing" in other

15

states and "deprive[ed] businesses and consumers in other [s]tates of whatever competitive advantages they may possess." *Pork Producers*, 598 U.S. at 374 (internal citations and quotation marks omitted). Unlike such laws, the Act does not tether an identified drug's Reference Price to prices in any other *state*, but to such drug's WAC, which manufacturers (and not distributors, such as HDA's members) set *nationally*. *See* ECF Nos. 27-1, at 4; 34, at 2–4. And whereas in *Brown-Forman* the challenged law impacted liquor prices in other states, *see* 476 U.S. at 583 (finding "that once a distiller's posted price is in effect in New York, it must seek the approval of the New York State Liquor Authority before it may lower its price for the same item in other [s]tates), there is no similar applicable provision in the Act.

HDA also asserts that the Act has the "specific impermissible extraterritorial effect" of "mandat[ing] an artificially lower price" for identified drugs sold by covered distributors in Connecticut "than the prevailing WAC in other states," which will "give local consumers an advantage over consumers in other [s]tates." ECF No. 44, at 8 (internal citation and quotation marks omitted); *see also* ECF Nos. 27-1, at 17; 35, at 1, 4–6. However, the Act does not mandate that HDA's members sell identified drugs in Connecticut at prices lower than anywhere else, as did the challenged laws in *Brown-Forman* and *Healy*. *See* ECF Nos. 27-1, 1–3; 34, at 6. HDA's members are free to sell identified drugs in other states at prices lower or higher than the Reference Price. *Cf. Healy*, 491 U.S. at 336 (noting that the dormant Commerce Clause prevents a state from regulating commerce which takes place "*wholly outside*" its borders) (emphasis added). Instead, the Act prohibits HDA's members from selling such drugs in Connecticut at prices that exceed what Connecticut's General Assembly considers to be safe and affordable, regardless of what

16

prices they may be charging elsewhere. *See* ECF Nos. 27-1, 1–3; 34, at 6; *see also* ECF No. 27-1, at 8 (recognizing that "'price regulation statutes' are impermissible if they 'require[] out-of-state commerce to be conducted according to in-state terms,'" but not otherwise) (quoting *Nat'l Elec. Mfrs. Ass'n v/ Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001)); *Fais*, 749 F. Supp. 3d at 526, *aff'd*, 110 F.4th at 209 (finding that the challenged law "is nothing like those Connecticut and New York laws" in *Baldwin*, *Brown-Forman*, and *Healy* because it "applies equally to New Jersey businesses and out-of-state businesses, so out-of-state businesses are on no way disadvantaged as compared to their New jersey competitors," and because "every burden imposed upon out-of-state businesses is likewise imposed on New Jersey businesses").

Finally, HDA expresses concern that other states may follow Connecticut's legislative lead.[9]  ECF No. 27-1, at 9, 11.  The Supreme Court noted in *Healy* that the challenged law "might be enacted" by other states if not invalidated, thereby creating "just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude."  *Healy*, 491 U.S. at 337.   But, as discussed *infra*, the Act is not comparable to the challenged law in *Healy*, as it does not prevent HDA's members from increasing or decreasing their drug prices in other states.  *See* ECF Nos. 27-1, 1–3; 34, at 6.  Nor does it otherwise prevent or discourage competition among distributors, who may still offer volume discounts outside of Connecticut, as they wish, free from interference by Connecticut.  *Id.*

---

[9] The court notes that there is some irony in arguing that a state's action to protect against price gouging or oppressive pricing essentially amounts to a concerted effort (or at least inspires the possibility) for states to do the opposite in similarly protecting their citizens from predatory but constitutional pricing.

Antidiscrimination "lies at the 'very core'" of the dormant Commerce Clause. *Pork Producers*, 598 U.S. at 369 (citing *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)). Because HDA has not shown that the Act is protectionist or discriminatory, the court finds that it is unlikely to succeed on the merits of its dormant Commerce Clause claim. Heeding the Second Circuit's warning "not to wield the dormant Commerce Clause as 'a roving license . . . to decide what activities are appropriate for state and local government to undertake,'" the court will not enjoin Defendants from enforcing the Act based on HDA's arguments about effectiveness. *Rest. L. Ctr.*, 90 F.4th at 119. (citing *Pork Producers*, 598 U.S. at 380 (Gorsuch, J., plurality opinion)).

### B. Remaining Preliminary Injunction Factors

The court cannot "'stay' Defendants' enforcement of the Act absent a clear showing of HDA's "likelihood of success on the merits" of its claims. *Nat'l Ass'n for Gun Rts.*, 685 F. Supp. 3d at 75 (quoting *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)). HDA has not made such a showing. *See infra*, 11-18. Accordingly, the court "need not reach the remaining preliminary injunction factors" before denying its Motion for a Preliminary Injunction. *Id.* at 113.

## IV.   CONCLUSION

For all the foregoing reasons, it hereby is **ORDERED AND ADJUDGED** as follows:

**(1)**   The Motion for a Preliminary Injunction is **DENIED**;

**(2)**   HDA **SHALL** file either an amended complaint accounting for Defendants' clarifications concerning the Act's applicability, or a notice that it does not intend to amend the Complaint, on or before **January 23, 2026;** and

**(3)**    Defendants **SHALL** file a response to the operative complaint within **twenty-one**

      **days** of HDA filing its amendment or notice, *see* ECF No. 32, or on or before

      **February 13, 2026**, whichever date is sooner.


      **IT IS SO ORDERED** in Hartford, Connecticut, this 24th day of December, 2025.


                                        /s/
                          OMAR A. WILLIAMS
                          UNITED STATES DISTRICT JUDGE